O

1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         CENTRAL DISTRICT OF CALIFORNIA
10
11  EMILIANO MICHAEL DE      )  Case No. EDCV 11-01425 VAP
    CONTRERAS, AN            )  (DTBx)
12  INDIVIDUAL, et al.       )
                             )  **ORDER GRANTING DEFENDANTS'**
13            Plaintiffs,    )  **MOTION FOR SUMMARY JUDGMENT**
                             )  **IN PART AND DISMISSING**
14      v.                   )  **PLAINTIFFS' REMAINING CLAIMS**
                             )
15  CITY OF RIALTO, A        )  **[Motion filed on August 23,**
    MUNICIPAL CORPORATION,   )  **2012]**
16  et al.,                  )
                             )
17            Defendants.    )
    _____ )
18
19
20      The Court has received and considered all Defendants'

21  papers filed in support of their Motion for Summary

22  Judgment and Plaintiffs' evidentiary objections to

23  Defendants' Motion for Summary Judgment.  A hearing on

24  this matter took place on September 10, 2012.  Both

25  parties' counsel submitted on the Court's tentative order

26  without oral argument.

27
28

# I. BACKGROUND

Plaintiffs Vanessa Morales, Raquel Padilla, Emiliano Michael De Contreras, and Mario Diaz filed a complaint on September 7, 2011 (Doc. No. 1) and an amended complaint on November 4, 2011 (Doc. No. 17), both of which alleged claims for civil rights violations under 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA"), assault, battery, intentional infliction of emotional distress, negligent supervision and hiring, negligence, and abuse of process.  The Court granted Defendants' unopposed motion to dismiss, with leave to amend, on December 27, 2011 (Doc. No. 25).  Plaintiffs filed their Second Amended Complaint on January 17, 2012 (Doc. No. 26), and their Third Amended Complaint ("TAC") on February 10, 2012, which named as Defendants City of Rialto, Officers Michael Mastaler, William Wilson, Michael Lee, and Scott Chilton (all in their individual and official capacities), Mark King (in his individual and official capacity), County of San Bernardino ("the County"), San Bernardino County Sheriff's Department, San Bernardino District Attorney's Office ("the DA's Office"), West Valley Detention Center ("WVDC"), Arrowhead Regional Medical Center ("ARMC"), and Does 1 through 10.  (Doc. No. 33.)  In their TAC, Plaintiffs asserted the following claims:

1.  Municipal Liability under 42 U.S.C. § 1983
    against the City, County, King, and "Does 6-10"
    ("First Claim");

2.  Violation of De Contreras's Fourth Amendment
    Rights brought under 42 U.S.C. § 1983 against
    King, Officers Mastaler, Wilson, Lee, and
    Chilton, and "Does 1-5" ("Second Claim");

3.  Violation of De Contreras's Fourteenth Amendment
    Rights brought under 42 U.S.C. § 1983 against
    King, Officers Mastaler, Wilson, Lee, and
    Chilton, and "Does 1-5" ("Third Claim");

4.  Violation of the Americans with Disabilities
    Act, 42 U.S.C. §§ 12100, et seq., against the
    City, County, and "Does 6-10" ("Fourth Claim");[1]

5.  Assault, against Officers Mastaler, Wilson, Lee,
    and Chilton, and "Does 1-5" ("Fifth Claim");

6.  Battery, against Officers Mastaler, Wilson, Lee,
    and Chilton, and "Does 1-5" ("Sixth Claim");

7.  Intentional Infliction of Emotional Distress
    ("IIED"), against Officers Mastaler, Wilson,
    Lee, and Chilton, and "Does 1-5" ("Seventh
    Claim");

8.  Negligent Supervision and Hiring, against the
    City and County ("Eighth Claim");

---

[1] Although Plaintiffs captioned their fourth claim as against the City, County, and Does 6-10 only, their claim includes all Defendants who moved to dismiss.  (See TAC ¶ 64.)

9.   Negligence, against all Defendants ("Ninth
     Claim"); and

10.  Abuse of Process, against all Defendants ("Tenth
     Claim").

On April 9, 2012, the Court granted, with leave to
amend, the motion to dismiss Plaintiffs' first, fourth,
eighth, ninth, and tenth claims against the County, the
Sheriff's Department, the DA's Office, WVDC, and ARMC.
(Doc. No. 42.)

On April 16, 2012, Plaintiffs filed their Fourth
Amended Complaint ("FAC") against the same Defendants
(Doc. No. 48); on April 25, Plaintiffs stipulated to
dismiss from the FAC all claims against the DA's Office,
ARMC, and the County, except those against the Sheriff's
Department for its operations of WVDC.  (Doc. No. 51.)
Since then, Plaintiffs, except for De Conteras,
stipulated to dismiss their fourth and fifth claims as
against the County (June 18, 2012 Stipulation (Doc. No.
62)), and De Contreras stipulated to dismiss all claims
against the County, its Sheriff's Department, and WVDC
(September 6, 2012 Stipulation (Doc. No. 105)).  All
Plaintiffs, including De Contreras, have stipulated to
dismiss from the FAC Defendants Mark Kling[2] and the

_____

[2] Mark Kling was erroneously identified in the FAC as
"Mark King."

4

Rialto Police Department (July 17, 2012 Stipulation (Doc. No. 69)); their second claim as to Mastaler (July 17, 2012 Stipulation (Doc. No. 70)); their sixth, seventh, and eighth claims as to all Defendants (July 18, 2012 Stipulation (Doc. No. 71)); their second and third claims as to Chilton and Wilson (July 18, 2012 Stipulations (Doc. Nos. 72, 73); their tenth claim as to Chilton and Lee (August 8 and 9, 2012 Stipulations (Doc. Nos. 85, 87)); and their first claim as to all Defendants (August 9, 2012 Stipulation (Doc. No. 86)).

On August 13, 2012, the remaining Defendants moved for summary judgment (Doc. No. 88, re-filed August 23 at Doc. No. 99) on the remaining FAC claims, summarized below:

1.  De Contreras's
    a.  Fourth Amendment claim against Lee for excessive force;
    b.  Fourteenth Amendment claim against Lee and Mastaler for fabricating police reports;
    c.  state law claim for abuse of process against the City, Wilson, and Mastaler; and
2.  All plaintiffs'
    a.  Rehabilitation Act claim against the City;
    b.  ADA claim against the City;
    c.  negligent supervision and hiring claim against the City; and

1        d.    general negligence claims against the City,

2              Wilson, and Mastaler.

3

4    Along with its Motion for Summary Judgment ("MSJ"),

5    Defendants filed a declaration of Jon F. Hamilton (Doc.

6    No. 99-6) attaching Exhibits A-Y (Doc. Nos. 99-2, 3, 4)

7    and a Statement of Undisputed Facts ("SUF" (Doc. No. 99-

8    7)).  On August 20, the deadline for filing an

9    opposition, Plaintiffs filed their Objection to Evidence

10   (Doc. No. 96) and no other documents.  Defendants replied

11   on August 27.  (Doc. No. 102.)

12

13                   **II. LEGAL STANDARD**

14   A motion for summary judgment shall be granted when

15   there is no genuine issue as to any material fact and the

16   moving party is entitled to judgment as a matter of law.

17   Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>,

18   477 U.S. 242, 247-48 (1986).  The moving party must show

19   that "under the governing law, there can be but one

20   reasonable conclusion as to the verdict." <u>Anderson</u>, 477

21   U.S. at 250.

22

23   Generally, the burden is on the moving party to

24   demonstrate that it is entitled to summary judgment.

25   <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998);

26   <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707

27   F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears

28

                              6

the initial burden of identifying the elements of the
claim or defense and evidence that it believes
demonstrates the absence of an issue of material fact.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When the non-moving party has the burden at trial,
however, the moving party need not produce evidence
negating or disproving every essential element of the
non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.
Instead, the moving party's burden is met by pointing out
there is an absence of evidence supporting the non-moving
party's case.  <u>Id.</u>

The burden then shifts to the non-moving party to
show that there is a genuine issue of material fact that
must be resolved at trial.  Fed. R. Civ. P. 56(e);
<u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The
non-moving party must make an affirmative showing on all
matters placed in issue by the motion as to which it has
the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;
<u>Anderson</u>, 477 U.S. at 252; <u>see also</u> William W. Schwarzer,
A. Wallace Tashima & James M. Wagstaffe, <u>Federal Civil</u>
<u>Procedure Before Trial</u>, 14:144.  "This burden is not a
light one.  The non-moving party must show more than the
mere existence of a scintilla of evidence."  <u>In re Oracle</u>
<u>Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir.
2010) (citing <u>Anderson</u>, 477 U.S. at 252).  "The

non-moving party must do more than show there is some
'metaphysical doubt' as to the material facts at issue."
In re Oracle, 627 F.3d at 387 (citing Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986)).

A genuine issue of material fact exists "if the
evidence is such that a reasonable jury could return a
verdict for the non-moving party."  Anderson, 477 U.S. at
248.   In ruling on a motion for summary judgment, the
Court construes the evidence in the light most favorable
to the non-moving party.  Barlow v. Ground, 943 F.2d
1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac.
Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.
1987).

### III. FACTS

**A.   Preliminary Matters**

    **1.   Evidentiary Objections**

Plaintiffs' counsel, Elena C. Correa, electronically
filed Plaintiffs' objections to Defendants' MSJ evidence.
Correa did not sign the document, either by hand or
electronically, nor did she submit a mandatory chambers
copy of the document.  Thus, the document Correa submits
is in violation of (1) Federal Rule of Civil Procedure
11(a) ("Every pleading, written motion, and other paper
must be signed by at least one attorney of record in the

attorney's name. . . ."); (2) Local Rule 5-4.3.4
(requiring electronically filed documents to be signed
and listing the acceptable forms of signature); (3) Local
Rule 5-4.5 (requiring delivery to chambers of a duplicate
in paper format of all electronically filed documents);
(4) Court's Standing Order ¶ 7 (Doc. No. 4) (requiring
the same); and (5) Local Rule 11-1 (requiring counsel's
signature on all documents except for declarations).

    Plaintiffs object on hearsay grounds to the
declarations of Rialto Police Corporal John Black (Ex.
C); Rialto Police Sergeant Christopher Hice (Ex. K);
former Rialto Jailer Libni Cerdenio (Ex. M); Physicians
Assistant Thomas Manning (Ex. N); Rialto Chief of Police
William "Tony" Farrar (Ex. T); former Rialto Police
Officer Michael Lee (Ex. W); and Rialto Police Officer
Michael Mastaler (Ex. X).  Plaintiffs also object to the
following documentary evidence: Taser Information Data
(Ex. L); Police Report and Supplemental Report (Ex. P);
and the Transcript of 911 Call (Ex. Q).

    Even if Correa had submitted Plaintiffs' objections
without the numerous deficiencies described above, the
Court nevertheless would overrule them.  Plaintiffs,
instead of identifying the objected-to portions of the
declarations, provide the page range for the entire
exhibit (or inaccurate pages that do not match the

objection).[3]  Objections based on hearsay are
particularly context-specific, and "[t]he Court is not
inclined to comb through these documents, identify
potential hearsay, and determine if any exception applies
– all without guidance from the parties."  <u>Clearman v.
Fernando</u>, No. 05-5633-AG, 2010 WL 431901 (C.D. Cal. Jan.
31, 2010), <u>aff'd</u>, 471 F. App'x 586 (9th Cir. 2012)
(quoting <u>Burch v. Regents of Univ. of Cal.</u>, 433 F. Supp.
2d 1110, 1124 (E.D. Cal. 2006)).

Plaintiffs' objections submitted by Correa are
utterly inadequate in procedure, form, and substance, and
are thus overruled.

### 2.  Plaintiffs' Failure to Oppose Defendants' MSJ

"Any party who opposes [a motion for summary
judgment] shall serve and file with the opposing papers a
separate document containing a concise 'Statement of
Genuine Disputes' setting forth all material facts as to
which it is contended there exists a genuine dispute
necessary to be litigated."  Local R. 56-1.  Where, as
here, a party fails to submit opposing papers or
evidence, the Court "may assume that the material facts
as claimed and adequately supported by the moving party
are admitted to exist without controversy."  Local. R.

_____

[3] Plaintiffs, for example, object to Exhibits C and
T, but cite to pages outside those exhibits.

56-3; <u>see also</u> Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for the purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it. . . ."). Thus, without an opposition or evidence from Plaintiffs, the Court applies standards consistent with Federal Rule of Civil Procedure 56 and determines whether Defendants' evidence demonstrates that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law. <u>See</u> <u>Henry v. Gill Indus., Inc.</u>, 983 F.2d 943, 949-50 (9th Cir. 1993).

## B. Defendants' Facts and Evidence

On August 14, 2010, at approximately 11:01 p.m., 13-year-old M.M. called 9-1-1 and reported to the Rialto Police Department that two men were fighting at 200 S. Linden Ave, Apt. 12T, and that one man, who M.M. identified as "Emiliano," had a knife. (SUF ¶¶ 1, 2; Ex. B at 21-22 (M.M. Dep.).) Officers Michael Lee and Michael Mastaler responded to M.M.'s call and, at approximately 11:08 p.m., were approaching the apartment as they heard M.M. call out for them to "hurry." (SUF ¶¶ 3, 4, Ex. B at 17.)

1    The officers knocked on the door to apartment 12T and
2  announced themselves as police officers, at which time
3  they heard yelling and banging from inside the apartment.
4  (SUF ¶¶ 5, 6.)  Lee went around to the side of the
5  apartment, jumping over a wall to gain access to an open
6  sliding glass door.  (SUF ¶ 7.)  Roughly five to ten
7  seconds after knocking, Mastaler broke down the front
8  door and entered at the same time that Lee entered from
9  the side door; both officers had their firearms drawn as
10 they entered the apartment.[4]  (SUF ¶¶ 8, 9; Ex. D. at 28-
11 29 (Lee Dep.); Ex. E. at 57, 58 (Mastaler Dep.).)  Once
12 inside the apartment, the officers immediately saw two
13 Hispanic men – Emiliano De Contreras and Mario Diaz –
14 "fighting" and "holding on to each other" (SUF ¶ 10; Ex.
15 D at 30), and Mastaler immediately saw two women, Vanessa
16 Morales and Raquel Padilla (Ex. E at 58).  One man, De
17 Contreras, was shirtless, and the officers recognized his
18 tattoos as "gang tattoos."  (Id.; SUF ¶ 20.)
19
20    The officers perceived that, within seconds of their
21 entry, De Contreras and Diaz recognized them as police
22 officers.  (SUF ¶ 11.)  Defendants' SUF describes the
23 following events, some of which are contradicted by
24 Defendants' submitted evidence, as described below.
25 "Upon seeing the officers in the apartment, Diaz
26
27    [4] According to Mastaler's deposition, he drew his
   firearm after he entered the apartment and observed the
28 men fighting.  (Ex. E at 57.)

1  immediately put his hands up and did not move" (SUF ¶ 13;

2  <u>see also</u> Ex. G at 92 (Diaz Dep.)), at which point the

3  officers yelled "commands for the males to get to the

4  ground." (SUF ¶ 15.)  Lee, observing that De Contreras

5  was not holding a knife, holstered his firearm and drew

6  his taser. (SUF ¶ 16.)  According to Lee, "De Contreras

7  then, with his hands jerking from the side of his head

8  forward, took an aggressive step towards the officers"

9  and yelled "shoot me m*****r f*****r," at which point Lee

10 fired his taser, the darts striking De Contreras's chest

11 and "incapacitating [him] momentarily." (SUF ¶¶ 17, 21,

12 22; Ex. D at 33.)

13

14     Defendants' submitted evidence describes these events

15 with some variation: According to Lee and Mastaler, Diaz

16 "dropped to the ground" and became compliant as soon as

17 he recognized the officers' presence. (Ex. D. at 32; Ex.

18 E at 57.)  According to Diaz, both he and De Contreras

19 ceased fighting, "quickly stopped in our place" and "just

20 stood there." (Ex. G at 92.)  According to De Contreras,

21 Diaz "sat on the couch and put his hands up" while both

22 De Contreras and Diaz tried to tell the officers that

23 they were deaf. (Ex. F at 81 (De Contreras Dep.).)  Lee

24 recounts that De Contreras "moved to the middle of the

25 room" and "then approached" the officers, with his hands

26 positioned "as if [he were] ready to fight." (Ex. D at

27 33.)  Mastaler states that De Contreras "stood up" and

28

then "rushed" him.  (Ex. E. at 57.)  Both Lee and
Mastaler recall that De Contreras advanced towards them
and that Mastaler pushed De Contreras away, which is when
Lee switched from his firearm to his taser and ordered De
Contreras to get on the ground.  (Ex. D. at 34-35; Ex. E
at 57-58.)  De Contreras did not comply and, at 11:16
p.m., Lee fired his taser at De Contreras.  (Ex. E at
63.; Ex. K ¶ 2 (Hice Decl.).)

    The following facts regarding what occurred after Lee
first fired his taser and approximate time measurements
are established by the video recording from Lee's taser.
(See Ex. J (Video Recording from Officer Lee's Taser)
(filed manually).)[5]  Second 1: The taser darts strike De
Contreras in the chest; he falls first to his knees and
then collapses face-down on the floor.  Seconds 2-7: He
begins to roll to his side and jerks his knees towards
his chest; his left arm extends into the air.  Seconds 8-
12: He rolls on to his back briefly and then rolls to his
right side.  His arms are moving, but they mostly are
blocked from view as his back is to the taser camera.
Seconds 13-22: He rolls face down with his left side
slightly up, supported by his right forearm.  Both arms
are bent at the elbow and tucked under his chest.

---

    [5] The video file on the disk submitted by Defendants
as Exhibit J does not appear to have audio as intended by
Defendants.  (See Ex. K ¶ 4.)  The Court relies on
Defendants' other submitted evidence to establish the
sounds during the duration of the video recording.

Seconds 23-26: He is face down, lying flat except for his arms tucked under his chest.  Seconds 27-32: He starts to roll over on to his right side; his arms move up and down several times; his mouth is open.  Second 33: From this point on, it appears from the camera angle that Lee is standing almost directly over De Contreras.  Seconds 33-38: Image is blurry; De Contreras appears to be rolled over on his right side and continues moving.  Seconds 39-41: He rolls back face-down so his back is to the camera. Second 42:[6] He rolls on to his back.  Seconds 43-46: Image is blurry; camera appears to be moving.  Second 47: He is lying flat, face-down, only part of his body is visible on camera.  (Video recording ends).

According to Mastaler, while on the ground after the first tasing, De Contreras "was struggling and moving and making some type of noise" (Ex. E at 64); Lee believed that De Contreras was trying to extricate the taser darts from his chest (SUF ¶ 24).  Neither Lee nor Mastaler, whose attention was focused on the three other adults in the room (SUF ¶ 22), attempted to handcuff De Contreras while he was on the ground after being initially tased (Ex. E at 68-69).  Lee ordered De Contreras to lay down on his stomach.  (SUF ¶ 23; Ex. E at 68-69.)  Forty-two seconds after Lee first fired his taser at De Contreras,

---

[6] According to the times recorded by Lee's taser (model X26), it is around second 42 that Lee deploys the second charge.  (See Ex. L (Taser Information Data).)

Lee discharged a second cycle of electricity into De
Contreras's chest.  (SUF ¶ 28; Ex. K ¶ 3.)  Lee
discharged the taser both times for five-second cycles.
(Ex. L (Taser Information Data).)  According to Mastaler,
Lee then placed De Contreras in handcuffs while Mastaler
held his firearm and provided cover.  (Ex. E at 70.)  Lee
does not remember placing De Contreras in handcuffs.
(Ex. D at 36.)  After De Contreras was handcuffed,
Mastaler told Lee that the four adult occupants of the
apartment were deaf, a fact he learned from 13-year-old
M.M., who at some point had entered the room.  (SUF ¶¶
31, 32; Ex. D at 37.)  According to Lee, before De
Contreras was tased and handcuffed, "[t]here was nothing
to indicate anyone there was deaf."  (Ex. D at 37; see
also Ex. F at 83 (De Contreras Dep.) ("[The officers]
didn't know we are deaf.").)

    After De Contreras was handcuffed, one of the
officers "put [Diaz] on the floor, face down[,]"
handcuffed him, and then sat him up on the couch while
the officers "dragged [De Contreras] out" of the
apartment (Ex. G at 93-94) and placed him in the back of
Lee's patrol car (SUF ¶ 37).  At 11:30 p.m., Lee began
driving De Contreras from the apartment to the Rialto
Police Station, where they arrived at 11:36 p.m.  (SUF ¶¶
37, 39.)  Lee does not recall who decided De Contreras
should be taken to the police station first instead of

16

1  the hospital, nor does he remember how he ascertained De
2  Contreras's identification information.  (Ex. D at 38-
3  39.)  Mastaler, meanwhile, remained in the apartment,
4  interviewing Morales and Padilla with M.M. serving as a
5  sign-language translator.  (SUF ¶ 54.)  Sometime during
6  Mastaler's investigation, Sergeant Scott Chilton, the
7  shift supervisor, arrived, assessed the situation, and
8  told Mastaler to contact him if Mastaler had difficulty
9  communicating with the witnesses.  (SUF ¶ 60.)  Mastaler
10  concluded his investigation, removed Diaz's handcuffs,
11  left the apartment, and began driving back to the police
12  station at 11:53 p.m.  (SUF ¶ 57; Ex. C ¶ 4 (Black
13  Decl.).)

14

15      While at the police station, De Contreras
16  communicated that he was in pain; he was taken to the
17  hospital at 11:54 p.m. and was seen by a doctor at 12:10
18  a.m.  (SUF ¶¶ 42, 43, 45.)

19

20      Mastaler, based on M.M.'s translation of Morales and
21  Padilla's statements, prepared the incident report and
22  narrative, which Lieutenant Wilson reviewed two days
23  later.  (SUF ¶¶ 63-65.)  Lee then prepared a supplemental
24  report, which Chilton reviewed.  (SUF ¶ 66.)

25

26

27

28

# IV. DISCUSSION

Defendants' asserted facts and supporting evidence, while at times conflicting as to non-material facts, are sufficient for the Court, lacking the benefit of any evidence or argument submitted by Plaintiffs, to find there is no triable issue of material fact as to any of Plaintiffs' claims. The Court considers below whether the undisputed facts entitle Defendants to judgment as a matter of law on each of Plaintiffs' claims.

## A.  De Contreras's Fourth Amendment Claim Against Officer Lee

### 1.  Excessive Force Standard

In Fourth Amendment excessive force actions brought under 42 U.S.C. § 1983, the two primary inquiries posed by a motion for summary judgment are (1) whether there was a constitutional violation (i.e., whether the uncontroverted evidence could reasonably be found to show that the officer's use of force was unreasonable); and (2) whether the officer is entitled to qualified immunity (i.e., whether the plaintiff's allegedly violated right was clearly established at the time of the injury).  See Pearson v. Callahan, 555 U.S. 223 (2009) (overruling the mandate in Saucier v. Katz, 533 U.S. 194 (2001), that courts address the constitutional question first, and holding that trial courts may address either inquiry first and may grant a defendant's summary judgment motion solely on qualified immunity grounds without reaching the

18

constitutional question).[7]  Summary judgment motions in excessive force actions require courts to "slosh [their] way through the factbound morass of 'reasonableness'" (Scott v. Harris, 550 U.S. 372, 383 (2007)); hence, the Ninth Circuit has stated that courts should grant summary judgment in excessive force cases sparingly.  See Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); Alexander v. Cnty. of Los Angeles, 64 F.3d 1315, 1322 (9th Cir. 1995) (stating that in most excessive force cases, the question of reasonableness "is normally a jury question").

    The Fourth Amendment's prohibition of excessive force is premised on the notion that "bodily integrity [is] 'a cherished value in our society.'" United States v. Kreisel, 508 F.3d 941, 948 (9th Cir. 2007) (quoting Schmerber v. California, 384 U.S. 757, 772 (1966)).  "A

---

[7]  The Ninth Circuit, in an excessive force case involving police tasers, expressed a preference to "follow the Saucier order . . . because this 'two-step procedure promotes the development of constitutional precedent' in an area where this court's guidance is sorely needed." Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (en banc), cert. denied, 132 S. Ct. 2681 (2012) (quoting Pearson, 555 U.S. at 236.)

claim against law enforcement officers for excessive
force is analyzed under the Fourth Amendment's 'objective
reasonableness' standard." <u>Arpin v. Santa Clara Valley
Trans. Agency</u>, 261 F.3d 912, 921 (9th Cir. 2001) (citing
<u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989)).  "The Fourth
Amendment requires police officers making an arrest to
use only an amount of force that is objectively
reasonable in light of the circumstances" as perceived by
a reasonable officer at the scene.  <u>Blankenhorn v. City
of Orange</u>, 485 F.3d 463, 477 (9th Cir. 2007) (citing
<u>Tennessee v. Garner</u>, 471 U.S. 1, 7-8 (1985)); <u>Graham</u>, 490
U.S. at 396-97.  Courts determine whether the use of
force was objectively reasonable through "a careful
balancing of the nature and quality of the intrusion on
the individual's Fourth Amendment interests against the
countervailing governmental interests at stake." <u>Graham</u>,
490 U.S. at 396.

    With respect to the Fourth Amendment intrusion side
of the balance, courts must "assess the gravity of the
particular intrusion on Fourth Amendment interests by
evaluating the type and amount of force inflicted."
<u>Miller v. Clark Cnty.</u>, 340 F.3d 959, 964 (9th Cir. 2003).
With respect to the countervailing government interest
side of the balance, courts must consider the three
factors established in <u>Graham</u>: (1) the severity of the
suspect's alleged crime; (2) the threat posed by the

suspect to the officers and the public; and (3) whether the suspect was actively resisting or evading arrest. 490 U.S. at 396. "'These factors, however, are not exclusive. Rather, [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in <u>Graham</u>.'" <u>Mattos</u>, 661 F.3d at 441[8] (quoting <u>Bryan v. MacPherson</u>, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation marks omitted)). <u>See, e.g.</u>, <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1283 (9th Cir. 2001) (requiring courts to account for the fact that a plaintiff is "emotionally disturbed" in their <u>Graham</u> balancing); <u>Chew v. Gates</u>, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994) (listing the following additional factors a court may consider: "whether a warrant was used, whether the plaintiff resisted or was armed," the number of suspects or officers involved, whether the plaintiff was sober, "the availability of alternative methods" of effecting the arrest, "the nature of the arrest charges," and "whether other dangerous or exigent circumstances existed at the time of the arrest"); <u>Headwaters Forest Defense v. Cnty. of Humboldt</u>, 240 F.3d 1185, 1204 (9th Cir. 2000), <u>vacated on other grounds</u>, 534 U.S. 801 (2001)

---

[8] Because the Ninth Circuit consolidated its en banc rehearings of <u>Brooks v. City of Seattle</u>, 599 F.3d 1018 (9th Cir. 2010), and <u>Mattos v. Agarano</u>, 590 F.3d 1082 (9th Cir. 2010), the en banc rehearings for both cases are referred to by the citation <u>Mattos v. Agarano</u>, 661 F.3d 433 (2011) (en banc).

1  ("[P]olice are required to consider what other tactics if

2  any were available to effect the arrest.").

3

4      In the Ninth Circuit, "threat" is "the most important

5  single element of the three specific [Graham] factors."

6  Chew, 27 F.3d at 1441.  "A simple statement by an officer

7  that he fears for his safety or the safety of others is

8  not enough; there must be objective factors to justify

9  such a concern."  Bryan, 630 F.3d at 826 (citation and

10 internal quotations omitted).  When the circumstances

11 show that a reasonable officer would not perceive the

12 need for force, "any force used is constitutionally

13 unreasonable."  Sanders v. City of Fresno 551 F. Supp. 2d

14 1149, 1166 (E.D. Cal. 2008), aff'd, 340 F. App'x 377 (9th

15 Cir. 2009) (citing Fontana v. Haskin, 262 F.3d 871, 880

16 (9th Cir. 2001)); Motley v. Parks, 432 F.3d 1072, 1089

17 (9th Cir. 2005).

18

19     In Bryan, the Ninth Circuit considered the

20 reasonableness of the same use of force at issue here: a

21 model X26 taser deployed in dart mode.[9]  (See Ex. L.)

22 _____

23     [9] Tasers can be deployed in either dart mode or
   drive-stun mode.  "When a taser is used in drive-stun
24 mode, the operator removes the dart cartridge and pushes
   two electrode contacts located on the front of the taser
25 directly against the victim. In this mode, the taser
   delivers an electric shock to the victim, but it does not
26 cause an override of the victim's central nervous system
   as it does in dart-mode."  Mattos, 661 F.3d at 443.  The
27 initial Brooks panel found a taser deployed in drive-stun
   mode to be a lower level of force than one deployed in
28                                        (continued...)

                            22

The X26 uses compressed nitrogen to propel a pair of 'probes' – aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires – toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.  The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  The tasered person also experiences an excruciating pain that radiates throughout the body. . . . Beyond the experience of pain, tasers result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended. <u>Matta-Ballesteros v. Henman</u>, 896 F.2d 255, 256 n. 2 (7th Cir. 1990); <u>see also</u> <u>Beaver v. City of Federal Way</u>, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) ("[A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo."). Moreover, tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.

<u>Bryan</u>, 630 F.3d at 824-25 (some internal citations omitted).  <u>See also</u> <u>Hickey v. Reeder</u>, 12 F.3d 754, 757 (8th Cir. 1993) (cited by <u>Bryan</u>, 630 F.3d at 811-12, 824-25) (stating that a taser "inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless").

The <u>Bryan</u> court further found that "[a] reasonable police officer with . . . training on the X26 [equal to

_____

[9](...continued)
dart mode (<u>see</u> <u>Brooks</u>, 599 F.3d at 1026-28), but, upon en banc rehearing, the Ninth Circuit declined to designate drive-stun mode at a specific level of force (<u>Mattos</u>, 661 F.3d at 443).

1  that of the defendant] would have foreseen these physical

2  injuries [including shattered teeth, facial abrasions,

3  and a barbed probe lodged in the plaintiff's flesh,

4  requiring hospitalization so that a doctor could remove

5  the probe with a scalpel] when confronting a shirtless

6  individual standing on asphalt."  Id. at 824.

7

8       Given these findings, the Ninth Circuit established

9  in Bryan that firing an X26 taser at a suspect one time

10 constitutes "an intermediate, significant level of

11 force."  Id. at 826.[10]

12

13      An officer's use of a taser is more likely to be

14 unreasonable when the officer deploys the taser more than

15

16 _____

17      [10] All circuits that have considered the question,
   including the Ninth Circuit, designate taser use
18 generally as non-lethal or less-than-lethal force.  See
   Bryan, 630 F.3d at 825 (citing similar findings from
19 other circuits).  There nevertheless have been numerous
   cases in Ninth Circuit courts in which a suspect died
20 after being tased by police officers, though the
   connection between the use of force and the suspect's
21 death is a subject of ongoing debate and ambiguity.  See,
   e.g., Rosa v. Taser Int'l Inc., 684 F.3d 941 (9th Cir.
22 2012); Marquez v. City of Phoenix, No. 10-17156 (9th Cir.
   Sept. 11, 2012); Sanders, 551 F. Supp. 2d; Neal-Lomax v.
23 Las Vegas Metro. Police Dep't, 574 F. Supp. 2d 1170 (D.
   Nev. 2008); Heston v. Taser Int'l, Inc., 431 F. App'x
24 586, 589 (9th Cir. 2011); LeBlanc v. City of Los Angeles,
   No. 04 CV 8250, 2006 WL 4752614, at *13 (C.D. Cal. Aug.
25 16, 2006); Tolosko-Parker v. Cnty. of Sonoma, Nos. 06 CV
   06841, 06 CV 06907, 2009 WL 498099 (N.D. Cal. Feb. 26,
26 2009); Salinas v. City of San Jose, No. 09 CV 04410, 2012
   WL 2906052 (N.D. Cal. July 13, 2012); Gillson v. City of
27 Sparks, No. 06 CV 00325, 2007 WL 839252 (D. Nev. Mar. 19,
   2007); Teran v. Cnty. of Monterey, No. 06 CV 06947, 2009
28 WL 1424470 (N.D. Cal. May 20, 2009).

1  once.[11]   In <u>Brooks v. City of Seattle</u>, the Ninth Circuit
2  en banc panel found as an "overwhelmingly salient factor"
3  the fact that the plaintiff was tased in drive-stun mode
4  "three times over the course of less than one minute," as
5  these tasings "in such rapid succession provided no time
6  for [the suspect] to recover from the extreme pain she
7  experienced, gather herself, and reconsider her refusal
8  to comply [with the officers' command to exit her
9  automobile]."   <u>Mattos</u>, 661 F.3d at 445.
10
11       **2.   Qualified Immunity Standard**
12       "[G]overnment officials performing discretionary
13  functions generally are shielded from liability for civil
14  damages insofar as their conduct does not violate clearly
15  established statutory or constitutional rights of which a
16  reasonable person would have known."   <u>Harlow v.</u>
17  <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982).   A plaintiff need
18  not point to a case specifically on point establishing
19  the official action as unlawful, but he must establish
20  that in light of pre-existing law the unlawfulness of the
21  _____

22       [11] Whether the officer fired the taser into the
     suspect's chest may also affect the intrusion side of the
23  <u>Graham</u> balancing.   <u>See</u> <u>Marquez</u>, No. 08 CV 01132 at 11062
     (Schroeder, J., dissenting) ("A recent study published
24  in a journal of the American Heart Association has
     concluded that a single taser shock to the chest can
25  kill. *See* Douglas P. Zipes, *Sudden Cardiac Arrest and*
     *Death Associated with Application of Shocks from a TASER*
26  *Electronic Control Device*, Circulation, Apr. 30, 2012, at
     4 (analyzing the medical records of eight healthy men,
27  seven of whom died after being tased in the chest area,
     and concluding that shocks from an X26 can cause cardiac
28  arrest).").

1  defendant's actions is apparent.  <u>Anderson v. Creighton</u>,

2  483 U.S. 635, 640 (1987).  "The contours of the right

3  must be sufficiently clear that a reasonable official

4  would understand that what he is doing violates that

5  right."  <u>Id.</u>

6

7       The Supreme Court recently emphasized the high burden

8  that must be met for a plaintiff to overcome qualified

9  immunity, replacing <u>Anderson</u>'s language of "a reasonable

10 official" with "*every* reasonable official" and stating

11 that "existing precedent must have placed the statutory

12 or constitutional question *beyond debate*."  <u>Ashcroft v.</u>

13 <u>al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011) (emphasis added).

14 The Supreme Court has also held that, "in an obvious

15 case, [the <u>Graham</u> standards for excessive force] can

16 clearly establish the answer, even without a body of

17 relevant case law" and that "officials can still be on

18 notice that their conduct violates established law even

19 in novel factual circumstances."  <u>Hope v. Pelzer</u>, 536

20 U.S. 730, 738, 741 (2002); <u>see also</u> <u>Mattos</u>, 661 F.3d at

21 442 (quoting <u>id.</u>).  The Ninth Circuit is "particularly

22 mindful of this principle in the context of Fourth

23 Amendment cases, where the constitutional standard –

24 reasonableness – is always a very fact-specific inquiry."

25 <u>Mattos</u>, 661 F.3d at 442.  "If qualified immunity provided

26 a shield in all novel factual circumstances, officials

27 would rarely, if ever, be held accountable for their

28

1    unreasonable violations of the Fourth Amendment."   Id.;
2    see also Deorle, 272 F.3d at 1286 ("Otherwise, officers
3    would escape responsibility for the most egregious forms
4    of conduct simply because there was no case on all fours
5    prohibiting that particular manifestation of
6    unconstitutional conduct.").   But see Mattos, 661 F.3d at
7    453 (Schroeder, J., concurring) ("One could argue that
8    the use of painful, permanently scarring weaponry
9    on non-threatening individuals, who were not trying to
10   escape, should have been known to be excessive by any
11   informed police officer under the long established
12   standards of Graham.   The Eleventh Circuit has recently
13   held that police officers using a taser were not entitled
14   to qualified immunity where no threat, or escape, was
15   imminent.   Fils v. City of Aventura, 647 F.3d 1272, 1289,
16   1292 (11th Cir. 2011).   Nevertheless, the Supreme Court's
17   opinion in al-Kidd appears to require us to hold that
18   because there was no established case law recognizing
19   taser use as excessive in similar circumstances, immunity
20   is required.").

**1.   Whether Defendants' Evidence Shows that Officer
Lee Used Reasonable Force**

**a.   Lee's First Taser Application**[12]

Defendants' evidence, uncontradicted by any
submission from Plaintiffs, shows that Lee's force was
not unreasonable as a matter of law when he first tased
De Contreras.

First, the Court evaluates the "nature and quality of
the intrusion" on De Contreras's "Fourth Amendment
interests." Graham, 490 U.S. at 396.  Plaintiffs submit
no evidence demonstrating the extent of De Contreras's
injury.  Defendants' evidence shows that (1) De Contreras
suffered a "Taser injury to his chest" requiring a
physician's assistant to "remov[e] the Taser darts and
administer[] the proper wound care"  (Ex. N (Manning
Declaration); see also Ex. O (ARMC Medical Record)); and
(2) Lee inflicted pain on De Contreras (see Ex. F. (De
Contreras Dep.) at 86 ("I was just focusing on the pain
that I was experiencing at that time in my chest."); 87
(De Contreras repeated the words "hurt" or "pain" after

_____

[12] In cases involving multiple taser applications,
district courts often analyze each application
separately.  See, e.g., Beaver v. City of Federal Way,
507 F. Supp. 2d 1137 (W.D. Wash. 2007); Sanders, 551 F.
Supp. 2d at 1167; Ciampi v. City of Palo Alto, 790 F.
Supp. 2d 1077 N.D. Cal. 2011).  The Court finds this
analytical method appropriate here in order to apply the
law to the precise factual circumstances.  Nevertheless,
the Court notes that these separate analyses are
contained within the overall Graham balancing of the
totality of the circumstances, which considers, for
example, the cumulative effects of the multiple tasings.

1    Lee brought him to the police station); id. ("I was all
2    messed up in my body.  I could feel it in my heart.").)
3    Additionally, the Court notes the general effects of
4    being tased in dart mode that have been described by the
5    Ninth Circuit, as discussed above.  See Bryan, 630 F.3d
6    at 824-26; Mattos, 661 F.3d at 441, 445.  These include
7    effects that are secondary to the taser's primary effect
8    of discharging electricity to incapacitate the suspect,
9    namely, the secondary effects of the barbed darts
10   puncturing the suspect's flesh[13] and the taser shock
11   causing the suspect to collapse to the ground,[14] as
12   observed in the video recording of De Contreras.

13

14       Second, the Court weighs this Fourth Amendment
15   intrusion against the government's countervailing
16   interests in tasing De Contreras.  Based on the evidence
17   provided, the Court finds all three Graham factors to

18

19       [13] The Bryan court found that "such 'superficial'
20   barbed dart injuries have the potential to be quite
     significant" and cited government studies indicating the
21   extent of such injuries and the impossibility of
     predicting how deeply into the skin the darts will embed.
22   Bryan, 630 F.3d at 813-14.  The court also considered as
     part of the Fourth Amendment intrusion that the plaintiff
23   "required emergency surgery to have the dart removed."
     Id. at 814-15.

24

25       [14] See id. (citing the head injuries and brain trauma
     that can result from the muscular incapacitation and
26   stating that tasers can cause "significant injury,
     especially if the tasered individual, like Bryan, lands
27   on a hard surface.  These injuries may even prove fatal,
     as [the taser manufacturer's] own training materials
28   warn").

1  weigh in favor of finding the use of force reasonable:
2  First, a reasonable officer who witnessed De Contreras in
3  a physical altercation with Diaz would have suspected him
4  of committing a violent assault that was ongoing until he
5  noticed the officers' presence.  Second, a reasonable
6  officer in Lee's circumstances would have feared that De
7  Contreras had a knife based on the initial 9-1-1 call,
8  would have observed that De Contreras at the moment was
9  agitated and willing to engage in violence, and would
10 have perceived that, at a minimum, De Contreras's
11 physical gestures and movements were potentially
12 threatening.  Third, while De Contreras was not
13 physically resisting arrest, a reasonable officer would
14 not have known that he was deaf and would have
15 interpreted his refusal to get on the ground as
16 intentional noncompliance with police orders.
17
18           **b.  Lee's Second Taser Application**
19      Between the first tasing and the second tasing,
20 however, it is less clear whether Defendants' submitted
21 evidence is sufficient such that a reasonable jury could
22 not find Lee's use of force in tasing De Contreras a
23 second time to be unreasonable.  With the second tasing,
24 the Fourth Amendment intrusion increased, as more pain
25 was inflicted and De Contreras's state of forced
26 paralysis was prolonged.  The incapacitating effects of
27 tasers in dart mode entail unique intrusions into one's
28

bodily integrity that increase with prolonged exposure.
In addition to the pain inflicted, tasers in dart mode
result in total loss of control over one's own body,
immobilization caused not by any external overpowering
force, such as a police control hold, but rather by a
forced internal separation of the mind and body.  The
longer a suspect's body is seized in this way, the
greater the intrusion into his Fourth Amendment rights
must surely be.  Cf. Bryan, 630 F.3d at 825-26 (internal
citations omitted) ("The X26 thus intrudes upon the
victim's physiological functions and physical integrity
in a way that other non-lethal uses of force do not.  . .
. [T]he pain delivered by the X26 is far more intense and
is not localized, external, gradual, or within the
victim's control.  In light of these facts, we agree with
the . . . characterization of a taser shot as a 'painful
and frightening blow.'")

Inversely, between the first and second tasing, the
evidence shows that the countervailing government
interest decreased.  De Contreras, collapsed on the
floor, unable to do more than roll to his side,
objectively posed far less of a threat than when he was
standing up and moving towards the officers.  Further, at
this point, a reasonable officer seeing De Contreras roll
on the floor, wearing only shorts, would have less fear
that De Contreras had a knife on his person or that, even

1   if he did, that he was in a condition allowing him to

2   gain access to and attack with the knife.  Most crucially

3   for the "threat" factor, after De Contreras was initially

4   tased, the evidence demonstrates that he was within the

5   officers' control.  For 42 seconds, De Contreras was

6   physically incapacitated by the taser charge, attached to

7   Lee's taser through the wired darts as Lee stood either

8   close to him or almost directly above him, and the

9   potential target of Mastaler's drawn firearm.  See

10  LaLonde v. Cnty. of Riverside, 204 F.3d 947, 961 (9th

11  Cir. 2000) ("[T]he use of [non-lethal] weapons . . . may

12  be reasonable as a general policy to bring an arrestee

13  under control, but in a situation in which an arrestee

14  surrenders and is rendered helpless, any reasonable

15  officer would know that a continued use of the weapon or

16  a refusal without cause to alleviate its harmful effects

17  constitutes excessive force."); Headwaters Forest Def. v.

18  Cnty. of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002)

19  (emphasis in original) ("Because the officers had control

20  over the protestors it would have been clear to any

21  reasonable officer that it was unnecessary to use pepper

22  spray to bring them under control, and even less

23  necessary to repeatedly use pepper spray against the

24  protestors when they refused to release from the

25  [restraints]."); Mendoza v. Block, 27 F.3d 1357, 1362

26  (9th Cir. 1994) ("[N]o particularized case law is

27  necessary for a deputy to know that excessive force has

28

1  been used when a deputy sics a canine on a handcuffed

2  arrestee who has fully surrendered and is completely

3  under control."); <u>Hammer v. Gross</u>, 932 F.2d 842 (9th Cir.

4  1990) (finding officers' force reasonable to place the

5  suspect under control but unreasonable when applied after

6  the suspect was under officer control); <u>accord</u> <u>Nelson v.</u>

7  <u>City of Davis</u>, 685 F.3d 867, 884-85 (9th Cir. 2012).

8  Thus, as De Contreras may have been under officer

9  control, he may have posed a level of threat to the

10 officers during those 42 seconds that did not justify the

11 additional use of force.

12

13    As to the third <u>Graham</u> factor, De Contreras cannot be

14 said to have been resisting arrest during those 42

15 seconds, as neither officer attempted to place him under

16 arrest.  At most, De Contreras was prone, but not

17 completely flat on his stomach as Lee ordered him.

18

19    The Court also considers the availability of

20 alternative methods to effectuate the arrest, another

21 salient factor here.  <u>See</u> <u>Smith v. City of Hemet</u>, 394

22 F.3d 689, 701-02 (9th Cir. 2005) (en banc); <u>Headwaters</u>

23 <u>Forest Defense</u>, 240 F.3d 1185 at 1204 ("[P]olice are

24 required to consider what other tactics if any were

25 available to effect the arrest.").  Lee was not required

26 to "use the least intrusive means available" to arrest De

27 Contreras (<u>Luchtel v. Hagemann</u>, 623 F.3d 975, 982 (9th

28

1  Cir. 2010)), but a reasonable jury might find that, at
2  some point during those 42 seconds, either officer could
3  have placed De Contreras in handcuffs with very little
4  risk to their safety, thus negating the need to expose De
5  Contreras to another taser shock.

6

7      Similarly, tasing De Contreras again 42 seconds after
8  the first tasing may in fact have impeded the
9  countervailing governmental interest by ultimately
10 delaying the arrest.  That is, waiting 42 seconds and
11 then tasing De Conteras again may have increased the
12 Fourth Amendment intrusion *and* decreased the efficacy of
13 the use of force as compared to the available
14 alternative: immediately handcuffing and arresting De
15 Contreras after the first tasing, when, as demonstrated
16 in the video recording, De Contreras was unable to do
17 more than roll on the ground and at various points was
18 face-down on the floor.  Like in Brooks, both sides of
19 the Graham balance may have shifted toward a finding of
20 unreasonableness when Lee, by discharging his taser a
21 second time, provided De Contreras "no time . . . to
22 recover from the extreme pain [he] experienced, gather
23 [him]self, and reconsider [his] refusal to comply."
24 Mattos, 661 F.3d at 441.

25

26

27

28

### c.  Totality of the Circumstances

Determining whether a reasonable jury could find that the totality of the circumstances did not justify Lee's use of force is complicated by the lack of clear precedent regarding police use of tasers, particularly with respect to the reasonableness of deploying the taser more than once.  Thus, before assessing the factors discussed above and determining whether, in light of the totality of the circumstances, a jury could reasonably find that the use of force was unreasonable, the Court turns to the question of qualified immunity.

### 2.  Qualified Immunity for Officer Lee

The incident at issue here occurred in August 2010, before the Ninth Circuit's final decisions in <u>Bryan</u>, <u>Brooks</u>, or <u>Mattos</u>, the cases providing the most extensive and recent guidance on tasers as a use of force.  Hence, the Court finds that Lee is entitled to qualified immunity because the law regarding a second application of a taser, after a first application that was objectively reasonable, was not then clearly established.

Specifically, it was not clearly established how firing a taser at a threatening suspect affects the degree of threat that every reasonable officer would perceive after that first tasing.  In fact, despite the many ways in which multiple tasings, particularly in the

incapacitating dart mode, would appear to shift the
Graham balance to weigh against reasonableness, the Ninth
Circuit has given this factor only brief consideration.
For example, in Sanders v. City of Fresno, the Ninth
Circuit affirmed summary judgment for officers who tased
an unarmed suspect five times in dart mode and five times
in drive-stun mode, exposing him to taser shocks for up
to seventy seconds total, leading to his death.   551 F.
Supp. at 1158-60.   The district court noted that, of the
precedent cases "involving multiple Taser applications,
each case found no constitutional violation." Id. at
1164.   In Beaver v. City of Federal Way, the district
court stated, "After reviewing the case law, the Court
concludes that in 2004, when [the plaintiff] was
arrested, the contours of Fourth Amendment jurisprudence
and, in particular, excessive force claims of this type,
were not sufficiently clear that a reasonable officer
would have understood that multiple tasings of [the
plaintiff] under these circumstances violated his
rights."   507 F. Supp. 2d at 1148.   Regarding the
reasonableness of multiple tasings, there has been little
clarification of the law since 2004.   Of the more recent
Ninth Circuit cases, only Brooks concerned multiple taser
applications, and that was in the context of a taser in
drive-stun mode.   See Mattos, 661 F.3d at 445.

1   As the applicable law regarding the reasonableness of

2   Lee's use of force was not clearly established at the

3   time of the injury, Officer Lee is qualifiedly immune.

4

5   In light of this finding, the Court declines to

6   determine whether a jury could find reasonably that Lee

7   violated De Contreras's Fourth Amendment rights.

8   Therefore, the Court grants summary judgment in favor of

9   Defendant Lee on De Contreras's Fourth Amendment claim.

10

11  **B.   De Contreras's Fourteenth Amendment Claim Against Lee and Mastaler for Fabricating Police Reports**

12

13  The record lacks any evidence to support Plaintiffs'

14  claim that Lee or Mastaler fabricated their police

15  reports.  Furthermore, as De Contreras was convicted on

16  the charges alleged in the police reports (see April 9,

17  2012 Minute Order Granting Motion to Dismiss at 7 (Doc.

18  No. 42)), he cannot now challenge the validity of those

19  police reports under 42 U.S.C. § 1983.  See Heck v.

20  Humphrey, 512 U.S. 477, 477 (1994) (holding that a claim

21  for damages that would invalidate a conviction or

22  sentence that has not already been invalidated or

23  reversed on direct appeal, by executive order, by an

24  authorized state tribunal, or by a writ of habeas corpus

25  is not cognizable under § 1983.)  Thus, Defendants are

26  entitled to summary judgment on De Contreras's Fourteenth

27  Amendment claim.

28

**C.  Plaintiffs' Rehabilitation Act and ADA Claims Against the City**

Plaintiffs allege that the City violated their rights under section 504 of the Rehabilitation Act of 1973, which provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  To state a claim under Section 504, Plaintiffs must show that (1) they are individuals with a disability; (2) they are otherwise qualified to receive the benefit; (3) they were denied the benefits of the program solely by reason of their disability; and (4) the program receives federal financial assistance.  <u>Weinreich v. L.A. Cnty. Metro. Transp. Auth.</u>, 114 F.3d 976, 978 (9th Cir. 1997).

In his Declaration, Chief of the Rialto Police Department William Farrar declares that the City "does not receive the federal funding necessary to trigger the application of the Rehabilitation Act." (Ex. T ¶ 12).  While the Court need not accept – and in fact doubts – Farrar's legal conclusion, there is no evidence before the Court that would allow a reasonable jury to find that the Rialto Police Department receives the public funding to make it bound by the Rehabilitation Act with respect

38

1  to Plaintiffs' allegations.  Furthermore, the evidence
2  demonstrates that Mastaler effectively communicated with
3  the witnesses after he learned they were deaf, and that
4  neither Lee nor Mastaler knew that De Contreras was deaf
5  until after he was placed under arrest.  Thus, because
6  there is no evidence submitted that could satisfy the
7  third or fourth elements of Section 504, Defendants are
8  entitled to summary judgment on Plaintiffs'
9  Rehabilitation Act claim.
10
11      To state a claim under Title II of the ADA,
12  Plaintiffs must show that (1) they are qualified
13  individuals with a disability; (2) they were either
14  excluded from participation in or denied the benefits of
15  a public entity's services, programs or activities, or
16  was otherwise discriminated against by the public entity;
17  and (3) such exclusion, denial of benefits, or
18  discrimination was by reason of their disability.
19  Weinreich, 114 F.3d at 978.
20
21      As "[t]here is no significant difference in analysis
22  of the rights and obligations created by the ADA and the
23  Rehabilitation Act," the Court analyzes these claims
24  simultaneously.  Zukle v. Regents of Univ. of Cal., 166
25  F.3d 1041, 1045 (9th Cir. 1999).  Thus, because no
26  evidence before the Court shows that Plaintiffs were
27  denied any benefit covered by the ADA or Rehabilitation
28

1  Act, Defendants are entitled to summary judgment on

2  Plaintiffs' ADA and Rehabilitation Act claims.

3

4  **D.    Plaintiffs' State Law Claims for Abuse of Process,
        General Negligence, and Negligent Supervision and**

5  **Hiring**[15]

6      A district court may decline to exercise supplemental

7  jurisdiction over a state claim if "the district court

8  has dismissed all claims over which it has original

9  jurisdiction." 28 U.S.C. § 1367(c)(3).

10 "The Supreme Court has stated, and we have often

11 repeated, that 'in the usual case in which all federal-

12 law claims are eliminated before trial, the balance of

13 factors . . . will point toward declining to exercise

14 jurisdiction over the remaining state-law claims.'" Acri

15 v. Varian Associates, Inc., 114 F.3d 999, 1001 (9th Cir.

16 1997) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S.

17 343, 350 n. 7 (1988)).

18

19     After considering the jurisdictional principles of

20 judicial economy, procedural convenience, fairness to

21 litigants, and comity, the Court finds it appropriate to

22 decline supplemental jurisdictional over Plaintiffs'

23 remaining state law claims.  See id. at 343.

24 _____

25     [15] Plaintiffs' negligence claims are pled under state
   law standards and Plaintiffs do not allege facts

26 sufficient to state a claim under federal law.  Cf.
   Monell v. Dep't of Soc. Servs. of City of New York, 436

27 U.S. 658 (1978); Bd. of Cnty. Com'rs of Bryan Cnty. v.
   Brown, 520 U.S. 397(1997); City of Canton, Ohio v.

28 Harris, 489 U.S. 378 (1989).

**VI. CONCLUSION**

For the foregoing reasons, the Court GRANTS summary judgment in favor of Defendants on Plaintiffs' federal law claims and DISMISSES WITHOUT PREJUDICE to refiling in state court Plaintiffs' remaining claims.

Dated:  September 25, 2012

VIRGINIA A. PHILLIPS
United States District Judge